AUGUSTINE J. DALY *vs.* BRIDGET HUSSEY & another.

Middlesex.    February 3, 1931. — February 27, 1931.

Present: RUGG, C.J., CROSBY, PIERCE, SANDERSON, & FIELD, JJ.

*Probate Court,* Jury issues, Appeal.   *Will,* Validity.   *Unsound Mind.*

A motion, by next of kin opposing a petition for proof of the will of a
   single woman who died at the age of sixty-seven, for a jury issue as
   to her soundness of mind, should have been allowed upon statements
   by counsel of expected evidence that, although the woman for many
   years "controlled" a violent temper and delusions from which she had
   suffered and at times displayed acumen with respect to her invest-
   ments and property, and in her will, which was executed about a month
   before her death, made some provision for her sisters, a niece and a
   nephew, next of kin, as well as for many of her cousins, she made no
   provision for those cousins with whom she had been intimate and
   gave about one half of her whole estate to a hospital in which she
   had never been treated and which she had never visited until shortly
   before her death; that she had been committed to an institution for
   the insane for a few months about thirty-eight years before her death;
   that for several years before her death she had been increasingly
   violent in her temper and subject to a certain delusion which so
   obsessed her as to prejudice her violently against anyone who did
   not give full credence thereto, whereby, shortly before the will was
   executed, she turned completely against one of her sisters and certain
   of her relations with whom she had been most intimate; and that,
   in the opinion of alienists, she had suffered for years and up to the
   time of her death from a certain form of insanity which caused the
   delusions, and, by reason thereof at the time of the execution of the
   will, she did not have that understanding of the nature and extent
   of her property, of her relations to those who naturally would have
   some claim to her remembrance, and of the significance of her acts,
   which she would have had if she had been free from such delusions.

PETITION, filed in the Probate Court for the county of
Middlesex on March 12, 1930, for proof of the will of Mary
J. Hussey, late of Cambridge.

Certain next of kin of the deceased filed a motion for
jury issues.   The motion was heard by *Beane,* J., upon
statements by counsel of expected evidence, a stenographer
having been appointed under G. L. c. 215, § 18, as amended.
Material portions of such statements are described in the

opinion. The judge denied the motion. The respondents appealed.

*J. G. Bryer,* for the respondents.

*J. A. Daly,* (*P. L. Spain* with him,) for the petitioner.

PIERCE, J. This is an appeal to this court by the respondents in a petition, filed in the Probate Court, for the proof of the will of Mary J. Hussey, late of Cambridge, Massachusetts, from an order of a judge of the Probate Court denying their motion that issues be framed for a jury: (1) as to the execution of the will, and (2) as to the testamentary capacity of the decedent. "The first ground is waived" and was not argued.

It is settled law in this Commonwealth that a person of pathologically unsound mind may possess testamentary capacity at any given time and lack it at all other times. *May* v. *Bradlee,* 127 Mass. 414. *Taylor* v. *Creeley,* 257 Mass. 21, 29. Whenever the issue of testamentary capacity is raised, the dominant question is: At the time the will was executed could the decedent recall to his mind not only the nature and the amount of his property but also those persons who, to use a common phrase, had claim on him? *Banks* v. *Goodfellow,* L. R. 5 Q. B. 549. Or, to quote from *Whitney* v. *Twombly,* 136 Mass. 145, at page 147: Had the decedent the ability "to understand, and carry in her mind, in a general way, the nature and situation of her property, and her relations to those persons who are about her; to those who would naturally have some claim to her remembrance; to those persons in whom, and those things in which, she has been mostly interested . . . the nature of the act she was doing, . . . and free from any delusion which was the effect of disease, and which would or might lead her to dispose of her property otherwise than she would have done if she had known and understood correctly what she was doing"? Under the rule formulated in *Fuller* v. *Sylvia,* 240 Mass. 49, 53, on the appeal of the contestants from the order denying their motion, on the evidence of facts offered to be proved, to frame a jury issue upon the question of the decedent's testamentary capacity on February 8, 1930, the question

which is before this court is: Do such facts if proved "present a real question proper for judicial inquiry," or is "the opposition to the will . . . entirely unfounded in law, resting on the disappointment or anger of a dissatisfied heir, or on his hope, by threatening trouble and expense to the estate, to induce the legatees to buy a settlement"?

Having in mind the above stated governing rules as to the right of appeal in this class of probate appeals, and to the definition of testamentary capacity above quoted, we proceed to state, in substance, the evidence which was before the Probate Court in the form of an offer to prove facts and deal with the whole case, including questions of fact as well as of law, giving to the decision of the probate judge the weight to which it seems to be entitled in the light of the whole record. *Clark* v. *McNeil,* 246 Mass. 250, 256. *Wilbar* v. *Diamond,* 249 Mass. 568, 573. *Crockett* v. *Snow,* 258 Mass. 133.

The facts offered to be proved disclose that the decedent was born in Ireland, and died in Cambridge, Massachusetts, on March 3, 1930, at the age of sixty-seven. She never married. Her immediate family consisted of an unmarried sister of the whole blood, named Bridget, who is one of the contestants, a married sister, Julia Reardon, of the half blood, the other contestant, a brother of the half blood, two nieces, a nephew and a number of cousins of varying degrees. The decedent had lived in this country since she was five years old. She did domestic work all her life with the exception of a few years during which she maintained a small variety store, in Cambridge. About the year 1924, she purchased some real estate in Cambridge, and subsequently sold it at a profit of $20,000 to $25,000. Her will was executed on February 8, 1930, her estate consisting of about $40,000 in bank deposits, a few stocks, and one piece of real estate. By her will she bequeathed her personal effects to her sister Bridget. She created thereunder a trust of $20,000, under which her trustees were to pay the net income thereof to her sister Bridget during her natural life, and a reasonable sum for

the expenses of the funeral of her said sister if the sister made such a request in her lifetime. After the death of Bridget and the payment of her funeral expenses, her trustees were to distribute the trust fund as provided in the will. Under this provision among thirty-four items, $2,000 goes to her niece Mary E. Reardon, daughter of the contestant Julia Reardon, $2,000 to her nephew John Reardon, a son of the contestant, $1,000 to her half sister Julia Reardon, $8,000 to her cousins and distant relatives, with the balance of the trust fund to various Roman Catholic charities. The rest and residue of her estate amounting to about one half of it she gave to the Carney Hospital " for the purpose of helping to pay for a new wing to said hospital which the hospital authorities are now contemplating building . . ." She had never been treated at the Carney Hospital and had " never been upon its premises until the week before the will was drawn when she visited the supervisor [Sister Superior] and, without making her identity known, inquired what use they could make of a bequest." With the exception of one or two of the cousins and distant relatives mentioned in the will, she was not intimate with any of them and, in fact, many of them she had never seen at all, or, in some instances, only on one occasion; while many cousins with whom she was on terms of most intimate relationship and with whom she frequently visited and spent Thanksgiving and Christmas holidays are wholly disregarded in the will.

In 1892 she was committed to the Worcester State Hospital for the Insane, and in its records is described as a person of violent temper and entertaining delusions of persecution, drugging, and attempts of relatives to murder her. She remained there four months and was then returned to the care of her sister. Toward the end of her life, with a steadily rising blood pressure and the development of a definite condition of arteriosclerosis affecting the brain and from which she finally succumbed, these insane delusions returned. Her sister of the full blood was committed to the same institution in 1916, and remained there eighteen months suffering, as the record discloses,

from a provisional diagnosis of arteriosclerosis and a determined diagnosis of dementia præcox. The contestants stated they were informed an uncle in Ireland died a violent death from insanity. The decedent, after her release from the hospital, "controlled" or kept to herself for many years her violent temper and delusions, and at times indicated a somewhat well balanced business acumen, in her investments and control of her property. About five or six years prior to her death she became obsessed with a belief that one O'Sullivan was making it his business to go among her neighbors, friends and relatives and spread stories of her unchastity, with claims that she had borne an illegitimate child by some unnamed man. She accused her parish priest of collusion and intrigue with O'Sullivan. She wrote the cardinal and persisted in her complaint so insistently that he sent a representative to disillusion her mind. The contestants offered to prove that this subject became more and more the sole matter of her thought, and on every occasion when she had "an opportunity she would start a discussion of the matter, and if any relative in any manner made light of it, or refused to give their undivided attention to her tirade she became violently angry, frothing at the mouth and pounding the table with her fists, using profane and abusive language not only to her imaginary *malinger* [maligner] but to those who crossed her line of thought with efforts to convince her of the error of her statements. This side of her mental condition increased in intensity as the years went on and she became increasingly abusive and violent in her temper toward the end of her life, constantly talking and muttering to herself when alone." The contestants stated to the probate judge that these facts may be brought out by the testimony of her physician, though a cotrustee and beneficiary under the will, who will testify that upon this phase of her mental makeup she was wholly unbalanced, and that many relatives, friends, neighbors and persons with whom she did business will corroborate these facts with their testimony.

The contestants further offered to prove that her sister

Julia Reardon was always on terms of family relationship with the decedent; that they visited back and forth at each other's house and frequently telephoned each other; that to this sister the decedent never omitted an occasion to enter upon a long tirade with reference to the imaginary scandalmonger; that the sister exerted her best efforts to convince the decedent that she must dismiss the matter and would try to get her mind into other paths; that these efforts resulted in the deceased entering upon an exhibition of violent·temper and she would "storm" from the house in a rage only to return in a few days on friendly terms; that the episodes occurred with increasing frequency toward the end of the decedent's last year of life, and after a violent outburst of temper at .Christmas time before she died she evinced a decided turn in her affections for the contestant Julia and her family, and refused to have little·more, if anything, to do with them, though the contestant used her best efforts to show her kindly sympathetic solicitude for her.

The contestants also offered to prove by numerous relatives, who have no interest in the outcome of this litigation, the same·decided change in the decedent's attitude, and that those with whom she had been on most intimate terms saw her turn completely against them; that this change of attitude continued up to the time of her death and was evidenced by an especially violent outburst the very week the will was drawn, and by other instances of delusions, without specifically stating the time of them with reference to the execution of the will.

They offered to prove by two outstanding psychiatrists and alienists, familiar with the medical history of the decedent's life, that she had " suffered for years from a form of insanity known as paranoia physchosis [sic] which in later years rapidly developed and progressed with the arterio sclerotic condition; that this mental condition brought about the delusions hereinbefore referred to and resulted in a prejudice against any who were within her physchosic [sic] circle or who did not give full faith and credence to her delusions. That this mental condition ex-

isted throughout her later life at the time her will was executed and up to the time of her death"; that in the opinion of these men she "was not of sound mind at the time her will was executed, and though she may at times have exhibited a more or less keen business sense and judgment, as a result of her insanity, she was not possessed of that degree of comprehension and understanding of the nature and situation of her peoperty [*sic*], her relations to those persons who would naturally have some claim to her remembrance, and to the persons in whom and the things in which she had been mostly interested, nor the nature of the acts she was doing, free from any delusions which was the effect of her aforesaid deceased [*sic*] mind."

Although the proponents of the will offered proof that her physician would testify that the decedent "was of sound mind" and offered to prove the high order of her business sagacity and prudence and that the will was intelligible and indicated what the decedent desired, we think the issue of the testamentary capacity of the decedent should have been framed, for the reason that an honest and genuine question of mental capacity arose on the offer of proof of facts. *Smith* v. *Brewster*, 247 Mass. 395. *New England Trust Co.* v. *Folsom*, 268 Mass. 342. *Sheppard* v. *Olney*, 271 Mass. 424.

*Order denying motion reversed.*