EDWARD T. SIMONEAU *vs.* LILLIAN B. O'BRIEN & another.

Middlesex.    December 3, 1941. — February 25, 1942.

Present: FIELD, C.J., DONAHUE, DOLAN, & COX, JJ.

*Probate Court*, Jury issues, Decree. *Unsound Mind. Undue Influence. Evidence*, Of testamentary capacity, Admissions. *Res Judicata.*

Statements of expected evidence in a contested will case, showing among other things that for years before his death the alleged testator had been suffering from alcoholism and mental paralysis and had been treated periodically in institutions; that alienists who had treated him were of the opinion that he was incapable of exercising memory, will power or judgment; and that about three months before his death he married as his second wife a nurse who knew of his condition, and a week after the marriage executed the alleged will naming her as sole beneficiary, presented a case proper for jury issues as to his soundness of mind and the exercise of undue influence upon him by her. ·

A decree of the Probate Court discharging one from guardianship as a spendthrift, entered by consent of his heirs, did not render res judicata the question of his capacity to make a will shortly thereafter, nor was the heirs' consent an admission that he then had testamentary capacity; the discharge was no more than evidence on the issue of such capacity.

A contestant of a will making a statement of expected testimony in support of a motion for jury issues is not required to disclose the names of the witnesses upon whom he relies to give such testimony unless the court so orders.

PETITION for proof of a will, filed in the Probate Court for the county of Middlesex on September 20, 1940.

The motion for jury issues was heard by *Leggat*, J.

*M. H. Sullivan*, (*R. E. Sullivan* with him,) for the respondents.

*G. B. Lourie*, for the petitioner.

DOLAN, J.    This is an appeal from a decree, entered in

the Probate Court, denying the respondents' motion that issues be framed for jury trial in the matter of the petition for probate of an instrument purporting to be the last will of William E. Brooks, late of Framingham, deceased.

The issues sought to be framed were (1) whether the instrument was executed according to law; (2) whether the decedent was of sound mind at the time of its execution; and (3) whether its execution was procured by the fraud or undue influence of Nellie Ambrose Brooks. The motion for jury issues was filed October 22, 1940. On November 20, 1940, the petitioner filed a motion that the respondents specify "as to what matters are objected to by them" and that they specify "all matters which they claim give rise to the issues of fact as set forth in their 'Motion to frame issues for jury trial.'" This motion was allowed on February 25, 1941. Following the allowance of this motion the respondents filed their specifications as "containing matters which they offer[ed] to prove" in support of their motion that issues be framed for jury trial. That motion was thereafter heard on these specifications of the respondents and upon a "Statement of Facts" by counsel for the petitioner.

The respective parties appear to be in accord as to the following facts: The decedent, who last dwelt in Framingham, died on August 29, 1940, leaving as his heirs, his widow, two brothers, Henry and Arthur Brooks, and a sister, Lillian B. O'Brien. The sister and Arthur are the respondent appellants. The decedent executed the instrument propounded for probate on May 20, 1940. Under its terms his entire estate of about $40,000 is bequeathed and devised to his widow.

The respondents' offer of expected testimony may be summarized as follows: In 1913 the decedent received a serious head injury in an accident when he was about twenty-eight years of age. (The petitioner stated that the accident occurred in 1913.) He was unconscious for many days and thereafter never was able to carry on business or employment independently, and did little even under the supervision of others. He had been for years prior to his

death under continuous medical care for alcoholism which had so impaired his memory, judgment and will, in the opinion of two alienists of long experience who had examined him and treated him over a long period, as to render him incapable of exercising any independent judgment or independent exercise of his will, and after the death of his first wife, Alice Brooks, in March, 1937, his mental collapse was complete. For five years prior to his death he was the subject of "mental treatment." During that time he had been examined at various times by alienists of repute, and was declared by them a fit subject for commitment to an institution for mental diseases. Instead of having him committed, his brothers and sister arranged to have him treated in private institutions where he voluntarily went on four different occasions, the last of such treatments lasting thirteen months, from July 1, 1938, until August 10, 1939. As to this the petitioner stated that the deceased was a patient at the Brattleboro Retreat in Brattleboro, Vermont, during that period, but that it was in pursuance of a plan by his guardian and "some of the contestants" to secure his admission to some institution. A nephew of the decedent was appointed the guardian of the decedent as a spendthrift in December, 1937.

. The respondents further stated that they expected to show by the testimony of witnesses that Nellie F. (Ambrose) Brooks, the widow of the decedent, a school nurse in the town of Framingham, "49 years of age," had been a neighbor of the decedent for many years; that in the spring of 1938 she began to influence him against his "housekeeper, guardian, relatives and his own best interests"; that she knew of her own knowledge as a trained nurse that he was physically and mentally incapable of caring for himself, and she exercised undue influence upon him to procure his discharge from guardianship; that at that time she procured an attorney at law, the petitioner in this case, to represent him in procuring his discharge from guardianship; that the attorney represented to the guardian that, as attorney for the decedent, he was interested only in the happiness of his client; that "it was clear that someone had to assist and

guide . . . [him] in his personal and property affairs";
that being under guardianship interfered with his happiness,
and "because of the complete confidence which . . . [the
decedent] had reposed in him that with the guardianship
removed, he, the . . . attorney, would coöperate with the
relatives to the end that the best interests of . . . [the
decedent] would be served"; and that he had known
Nellie F. Ambrose (later the wife of the decedent) for many
years and felt certain that she had no intention of trying
to engage in a marriage with the ward. The respondents
further stated that evidence would be introduced to show
that in reliance upon these representations the guardian
and other relatives of the decedent consented to the dis-
charge of the guardianship on or about March 28, 1940 (*sic*),
at which time a decree was entered to that effect.

The respondents further offered to show by expected
testimony that shortly after the termination of the guardian-
ship the decedent was taken to the Holden District Hospital
in Holden in this Commonwealth, by Nellie F. Ambrose
(now Brooks), where she had worked during her summer
vacations. The petitioner's counsel stated that on April
23, 1940, the petitioner visited the decedent at that hospital
and, as a result of a conversation with him, drafted a will
which was executed by him on May 4, 1940, under the
terms of which the decedent left $1 to his sister, the respond-
ent Lillian, and a like sum to his brother "F. Henry," his
interest in the "Frank E. Brooks Realty Trust" to his
brother Arthur, and the residue to Miss Ambrose, whom he
later married.

It is not disputed that the present widow of the decedent
procured a marriage license from the town clerk of Fram-
ingham, returned it filled out and made oath to it before
him on May 6, 1940, shortly after the decedent went to the
Holden District Hospital, and that a ceremony was per-
formed uniting her and the decedent in marriage "outside
of their own parish" on May 13, 1940. The respondents
offered to prove that on the day following the marriage the
decedent stated "that he did not know whether or not he
had been married."

In connection with this marriage ceremony the petitioner's counsel stated in substance that prior thereto a rumor had been spread through the neighborhood that the marriage was contemplated; that the guardian of the decedent communicated with the "parish priest" in Framingham and the latter sent for Miss Ambrose to discuss the matter with him; that she had a talk with him in the course of which she denied that there had been any talk of marriage between her and the decedent; that early in May, 1940, she decided to accept the proposal of the decedent for marriage, and returned to the same priest to arrange the marriage ceremony, which she did not wish performed in Framingham; that he informed her that he could not perform the ceremony at Holden and that she would have to take the matter up with the "local" priest; that she visited the latter who, after certain formalities had been complied with, performed the marriage ceremony on May 13, 1940, the day that the decedent was discharged from the Holden hospital.

The petitioner's counsel further stated that early in the morning of May 20, 1940, the decedent arranged to meet the petitioner at his office, and asked his advice relative to what to do about his will in view of his marriage; that he was advised that his marriage had invalidated his will; that thereupon he instructed the petitioner to draft "a new will, which is the present will," under the terms of which his widow is the sole beneficiary. The decedent executed it on that same day. He died about three months later, on August 29.

The respondents offered to prove that alienists who had examined the decedent from 1936 until his death would testify that for years preceding his death he had been suffering from mental paralysis; and that one of these alienists who had treated him daily in an institution for thirteen months (inferentially at the Brattleboro Retreat in 1938 and 1939), would testify that the decedent "was mentally incapable of doing anything requiring the exercise of memory, will power or judgment." The petitioner, on the other hand, stated that a named alienist

reported on December 26, 1939, after an examination made by agreement with the guardian as a basis for a petition for a discharge of guardianship, that on that date the testator was not "psychotic . . . nor insane in the legal sense of that word." The petition for discharge was filed in early February, 1940, and was heard on March 25, and a decree terminating the guardianship then was entered. The statement of expected testimony by the petitioner, upon whom rests the burden of proving that the decedent was of sound and disposing mind when he executed the instrument in question, does not, however, include any statement of expected testimony by any physicians who may have attended the decedent at or about that time or in the subsequent comparatively short period before his death.

It would serve no useful purpose to narrate in full the petitioner's statement of expected proof. For the purpose of clarity we have already interwoven important details of that statement with the respondents' statement of expected testimony. We think these details considered with the respondents' statement of expected testimony go far toward supporting a conclusion that there are issues in the present case proper for determination by a jury.

The petitioner has laid great stress upon the fact that a few weeks prior to the execution of the instrument in question, the decedent was discharged from guardianship by decree of the Probate Court, arguing that, since the respondents had notice of the petition for discharge and consented to the entry of the decree, it is res judicata of the testamentary capacity of the testator as of that date. We do not take that view. At most that decree created no more than a presumption of capacity of the ward to handle his own affairs, which was subject to be rebutted by evidence to show the contrary. It has been held that the appointment of a guardian of one as an insane person is not conclusive evidence of insanity and incapacity to make a will, but is merely prima facie evidence of his insanity and incapacity to make a will which may be overcome by other evidence sufficient to prove testamentary capacity. *Breed* v. *Pratt,* 18 Pick. 115, 116. *Garnett* v. *Garnett,* 114

Mass. 379, 381. See *Clifford* v. *Taylor,* 204 Mass. 358, 360, 361. It would seem to follow that a discharge from guardianship as an insane person could not have greater effect. Obviously a discharge from guardianship as a spendthrift, which is not an adjudication of insanity, can be no more than evidence to be considered with all the evidence bearing on a decedent's capacity to make a will. We do not agree with the contention of the petitioner that any evidence of the decedent's mental condition prior to "March 25th, 1940," the date of his discharge from guardianship, is irrelevant, nor that the failure of the respondents to oppose the petition for his discharge from guardianship was as matter of law an admission on their part that he was then of sound and disposing mind. See *Shailer* v. *Bumstead,* 99 Mass. 112, 130. There is nothing in the cases cited by the petitioner opposed to our view.

The petitioner objects that in the respondents' offer of proof no names of witnesses upon whose testimony they expected to rely have been disclosed by them. The short answer is that they were not required so to do. Whether such disclosure should be made rested in the discretion of the judge who, if he saw fit, could require the respondents to present testimony in a formal way. *Fuller* v. *Sylvia,* 240 Mass. 49, 53.

It has been said by this court frequently in cases such as the present one that much weight is to be given to the decision of the trial judge. But it is well established that in our consideration, where we have before us all that was before the trial judge, and no testimony of witnesses was heard by him, it still remains for us to determine whether or not a case has been presented proper for determination by a jury. In the instant case, after careful study, we are of opinion that the issues of the testamentary capacity of the decedent and whether the execution of the instrument presented for probate was procured by fraud of or by undue influence exercised upon him by Nellie Ambrose Brooks do present questions for the determination of a jury. See *Neill* v. *Brackett,* 234 Mass. 367, 368, 370, and cases cited. There is nothing in the record, however, to

warrant framing the issue of due execution of the alleged will.

Accordingly, the decree entered in the Probate Court is reversed and instead a decree is to be entered framing the following issues for jury trial: (1) Was the deceased, William E. Brooks, at the time of the execution of the alleged will propounded for probate of sound mind; (2) Was the execution of the alleged will of said William E. Brooks procured by the fraud or undue influence of Nellie Ambrose Brooks exercised upon the said William E. Brooks.

*Ordered accordingly.*