HARRY L. HIND, *vs.* EVELYN H. DeLONG.

Norfolk.   December 5, 1949. — February 6, 1950.

Present: QUA, C.J., LUMMUS, WILKINS, SPALDING, & COUNIHAN, JJ.

*Probate Court,* Jury issues.  *Unsound Mind.*

A motion for the framing of a jury issue respecting the testamentary
capacity of a woman who executed an alleged will in 1948 when about
sixty years of age should have been granted because a genuine ques-
tion of fact was presented in a statement by counsel of expected evi-
dence of disease affecting her mentally as a child, of abnormal or
eccentric conduct on her part for many years, and of expected testi-
mony by an alienist, at whose suggestion she had spent two weeks in
a sanitarium in 1945, that she unquestionably was not capable of
knowing what she was doing on the day she executed the alleged will,
and by a family physician, based on observation as late as 1946, that
she was "crazy" and not capable of making a will.

PETITION, filed in the Probate Court for the county of
Norfolk on November 10, 1948, for proof of the alleged will
of Florence H. Johnson, late of Brookline.

A motion for jury issues was heard by *Reynolds,* J.

*W. G. Todd,* (*R. E. Kelley* with him,) for the contestant.

*E. M. Murray,* for the proponent.

SPALDING, J.   Upon a petition for the allowance of an
alleged will of Florence H. Johnson, a motion was made by
the contestant to frame the usual jury issues on (1) execu-
tion, (2) testamentary capacity, and (3) undue influence.
The motion was denied and the contestant appealed. Only
the second issue (testamentary capacity) is now pressed.
The motion was heard solely upon oral statements of ex-

pected evidence presented by the proponent and the contestant.

The deceased, Florence H. Johnson, died on October 26, 1948. Her exact age at death does not appear but we infer from statements in the record that it was around sixty. She was survived by a brother, the proponent Harry L. Hind, and two married sisters, Grace M. Andrews and Evelyn H. DeLong, the latter of whom is the contestant. The alleged will was executed on February 4, 1948. With the exception of a small gift to the Angell Memorial Hospital for Animals, the deceased left all of her property to various relatives, and to persons connected with her family through marriage. The deceased gave the largest portion of her estate to her brother whom she also named as executor. The deceased's sister Grace M. Andrews was given several legacies, but nothing was given to the contestant.

A summary of the contestant's expected evidence is as follows: As a child, the deceased suffered a severe attack of scarlet fever which affected her mentally and from which she "never really recovered." As time went on she did not seem to mature and her actions down to the time of her death were more or less childish. The deceased was married twice. Her first husband committed suicide in 1932 and she "brooded over that." Her second husband, Johnson, died in an insane asylum. Though the deceased had been active in having her husband committed to the asylum, she later "wanted to sue the doctor for having committed him." At the burial service of her second husband and in the presence of the mourners "she went into a dance and said, 'I wonder who the next one will be.'" The deceased was morbid and depressed, and the contestant, who was very close to her and was called in by her in her last illness, would go to see her three or four times a week. On one occasion, when the contestant refused reimbursement from the deceased for some small purchases which she had made for her, the deceased threw the money out of the window of the automobile in which they were riding.

In 1945 the deceased, due to a very bad physical and

mental condition, fell downstairs, and received a severe bump on the head. Thereafter she had a delusion that she was going blind and consulted eight different oculists, at considerable expense, over a period of years, although, in fact, there was nothing the matter with her eyes. When visiting the home of the contestant, the deceased would "simply sit there . . . with her head thrown back over the chair," without uttering a word, except to complain of her head and eyes. The deceased "never really had a connective concentrated thought or thoughts" and most of her conversations, although at times coherent, were very much lacking in common sense. There were other instances of abnormal or eccentric conduct of the deceased on various occasions but they do not add much and need not be recited. Many of these incidents occurred long before the execution of the alleged will.

Sometime in 1945, at the suggestion of an alienist, the deceased spent two weeks in a sanitarium, and she was found to be psychoneurotic and very dissipated. The alienist at whose suggestion the deceased entered the sanitarium would testify that when he saw her in 1945 she was of unsound mind and that, based upon his observation of her then, together with "these various things and some others," she unquestionably was not "capable mentally of knowing what she was doing" on the day that she executed the alleged will. A family physician, who attended the deceased at least twenty-five times, and as late as 1946, would testify that the deceased "was crazy" and was not capable of making a will.

On the day that the deceased executed the alleged will she told a friend that she had left the contestant a "beautiful pin," whereas in fact she had left her nothing.

The principles of law applicable to cases of this kind have been fully set forth in the leading case of *Fuller* v. *Sylvia*, 240 Mass. 49, and in numerous cases decided since. See *Cook* v. *Mosher*, 243 Mass. 149; *Clark* v. *McNeil*, 246 Mass. 250; *New England Trust Co.* v. *Folsom*, 268 Mass. 342; *Sheppard* v. *Olney*, 271 Mass. 424; *Simoneau* v. *O'Brien*,

311 Mass. 68, 74. These decisions make it plain that the question to be decided by the probate judge is not whether he thinks that the controversy can be quite as well decided by a judge as by a jury but whether a genuine and doubtful question of fact is presented. We are of opinion that such a question was presented here. It is true that neither the family physician nor the alienist saw the deceased after 1946 and 1945, respectively, but the former's expected testimony of her condition in 1946, and that of the latter, who could and did take into consideration facts relating to her condition which have occurred since he saw her in 1945, along with the other evidence, presented a question which ought to be submitted to a jury.[1] The evidence here, we think, goes somewhat farther than that in *Union Trust Co.* v. *Magenis,* 259 Mass. 409, and in *Taylor* v. *Callahan,* 265 Mass. 582, which we have said mark "the extreme limit beyond which the court is not inclined to go" in upholding the denial of jury issues. *Swift* v. *Charest,* 268 Mass. 47, 50.

The order of the Probate Court denying the issue of testamentary capacity is

*Reversed.*

---

[1] Cases decided by this court in which the orders denying jury issues on the question of testamentary capacity have been reversed are *Smith* v. *Brewster,* 247 Mass. 395, *New England Trust Co.* v. *Folsom,* 268 Mass. 342, *Sheppard* v. *Olney,* 271 Mass. 424, *Daly* v. *Hussey,* 275 Mass. 28, *Mahoney* v. *Bailey,* 278 Mass. 12, and *Simoneau* v. *O'Brien,* 311 Mass. 68.