Fremont-Smith, Thayer, J.
These consolidated actions arise out of a dispute over the estate of the late Sarah P. McGeoghean of Cambridge. The disputants are her five surviving children, who are, in descending order of age, John, Kevin, Terrence and Timothy Mc-Geoghean and Maureen Fahey. Sarah died in September 2004. Shortly thereafter, Timothy filed for probate a will dated September 10, 2004, and in October 2004 John and Kevin filed an Affidavit of Objections to the will. That case is Estate of Sarah P. McGeoghean, Middlesex Probate and Family Court Docket No. 04P-4734EP1. Timothy later moved to substitute a prior iteration of the will, dated August 24, 2004.
Likewise in October 2004, Timothy, as managing member of 144 Smith Place LLC, brought an action to evict from those premises McGeoghean Waste Systems, Inc., a corporation operated by John. That action is 144 Smith Place, LLC v. McGeoghean Waste Systems, Inc., Middlesex Summary Process Docket No. 05-52SU24.
On December 31, 2004, John and Kevin commenced a Superior Court action as plaintiffs against Terrence, Timothy and Maureen and their spouses, seeking the rescission of conveyances of residential property made by the decedent to the defendants in 2001, the rescission of the conveyance of the business property at 144 Smith Place to the LLC in 2004, and requesting the conveyance of the latter property to John. Kevin seeks the conveyance to him of a summer home owned by the decedent in Hyannis. The defendants answered and counterclaimed, seeking, inter alia, an accounting from John for various sums alleged to belong to the decedent’s estate and a declaration that the estate is the 60% owner of the Waste Systems company.
A chronology of relevant events is as follows.
1) 1989: January 20, 1989: John McGeoghean, Sr. and James Kelley purchase 144 Smith Place property in Cambridge (each owns 50% as tenants-in-common). The purchase price is $990,000, with a mortgage given in the amount of $700,000. Kelley operates Cambridge Landscaping Co. on his half of the site and continues to do so to the present day. John, Sr. operates McGeoghean Construction, an unincorporated sole proprietorship, on the other half of the premises.
2) 1991: August 24, 1991: John, Sr. passes away, leaving eveiything to his widow, Sarah. Everything consists of:
A three-family house at 400 Walden Street, Cambridge.
A three-family house at 22-24 Saville Street, Cambridge.
The family home at 20 Saville Street, Cambridge.
A single-family home at 91 Sherman Street, Cambridge.
A summer home at 467 Ocean Avenue, Hyannis.
An undivided one-half interest as a tenant-in-common with James Kelley in commercial property located at 144 Smith Place (also numbered at 180-A Fawcett Street), Cambridge.
Also, at a family meeting shortly after John, Sr.’s death in 1991, it is agreed by the entire family that John would own 40% of the construction business and Sarah 60%, which reflected their contributions to the business.
3) 1992: January 7, 1992: McGeoghean Construction is incorporated and the stock is issued 60% to Sarah, 40% to John based on the respective financial contributions of Sarah and John and their agreement. Sarah also agrees to leave her 50% interest in Smith Place and her 60% interest in McGeoghean Construction to John if he continues to pay the bills on the Smith Place property (of which she is 50% owner with Kelly) and to pay a support salary to Sarah.[1]
4) 1994: January 5, 1994: Sarah gives a power of attorney to John.
5) 1996: April 23, 1996: Sarah meets with attorney Sanford Crane re: estate planning at office of John’s accountant, Stephen Troiano. Present are John, Sarah, Crane, Sarah’s daughter Maureen and Troiano.
6) 1997: October 24, 1997: 91 Sherman Street Realty Trust is formed and 91 Sherman Street, Cambridge, which was owned by Sarah, is deeded to the Trust. Trust borrows $1.3 million from Salem Five Cents Savings Bank for construction of condo apartments. John estimates to the bank that construction cost will be $1.2 million.
November 1997 - 1998: Construction of 91 Sherman Street condominium units by McGeoghean Construction. In July - September, condominium units (8 units total) are sold for a total of $2.65 million. $350,000 (her acquisition cost for the property) is paid to Sarah. Bank repaid $1.3 million. The Trust tax return reports profit of $170,000 which is paid to John for his work on the project.
7) 1998 - 2000: McGeoghean Waste Systems is incorporated. John, and his wife and children are 100% shareholders. McGeoghean Waste Systems, Inc. has no employees or equipment of its own. It pays McGeoghean Construction a management fee for the use of its employees and equipment. John winds down operations of McGeoghean Construction and transfers equipment to Waste Systems or disposes of it.
Sarah first meets with attorney Larry Frazer re: estate planning (introduced by John Duddy). Frazer drafts and sends estate planning documents to Sarah.
8) 2001: January 2001: Frazer meets with Sarah and Timothy, Maureen and Terrence.
*530 a) January 25, 2001: Estate planning documents executed by Sarah:
Her will makes testamentary bequest of $200,000 to John; testamentary bequest of $400,000 in Trust to Kevin; residue in trust to Timothy, Terrence and Maureen.
Sarah McGeoghean Revocable Trust for such residue is created.
Durable POA to Timothy (John’s 1994 POA not revoked).
Health Care Proxy to Maureen.
Kevin McGeoghean Trust, to be funded by $400,000 from her estate.
b) August 1, 2001:22-24 Saville Street property sold by Sarah to Maureen McGeoghean-Fahey and Sean Fahey for purchase price of $363,000 paid to Sarah and a gift of $237,000 to Maureen and her spouse.
c) September 17, 2001: 20 Saville Street property sold by Sarah to Timothy and Patricia McGeoghean for purchase price of $275,000 paid to Sarah and a gift of $200,000 to Timothy and his spouse.
d) October 5, 2001: 400 Walden Street property sold by Sarah to Terrence and Antoinette McGeoghean for a purchase price of $363,000 paid to Sarah and a gift of $237,000 to Terrence and his spouse.
e) October 2001: Sarah executes and files a “Vaughan” affidavit in connection with John’s divorce proceeding, indicating to the Probate Court that John will get a cash bequest as indicated in her 2001 will and nothing else.
9) 2002: March 1, 2002: Sarah purchases 40 Powers Road, Littleton for price of $347,500. She puts up $92,000 in cash and gives a mortgage to secure a note for $278,000. She indicates that she is purchasing the property for John.
10) 2003: September 25, 2003: Sarah gives POA to Maureen McGeoghean-Fahey.
a) September 2003: Sarah makes Maureen a signatory to Sarah’s Sovereign Bank account.
b) November 18, 2003: Sarah deeds Littleton property to John for a purchase price of $406,000 and a gift of $82,400 to John. The $50,749.69 net proceeds of sale are deposited in account in Sarah’s name over which John has signing authority.
11) 2004: January - March 2004:
Sarah gives POA to John January 5, 2004, revoking all prior POAs.
Sarah gives POA to Timothy March 12, 2004.
Attorney Frazer drafts 144 Smith Place Real Estate Trust dated March 12, 2004 and notarized seven days later on March 19, 2004. Timothy is sole trustee.
Sarah deeds her 50% interest in Smith Place to Timothy as Trustee (dated March 12, 2004 and notarized on March 19, 2004).
a) March 2004: Frazer meets with Sarah to redo her will. New will, which eliminates the $200,000 bequest to John and the $400,000 bequest in trust to Kevin, is drafted by Attorney Frazer based on his discussion with Sarah and Timothy and sent to Timothy. He drafts a revised will in March based on their discussion and sends the draft to Sarah (no copy has been located). He later sends a revised draft with a typewritten date of June.
b) August 21, 2004: Sarah is admitted to Massachusetts General Hospital for what ultimately becomes final hospitalization; see “night of September 12-13" entry below.
c) August 24, 2004: Sarah executes revised will. Sarah’s daughter Maureen witnesses, along with dialysis unit nurse and a notary brought by Maureen. This will omits the 2001 will’s $200,000 bequest to John and the $400,000 bequest in trust to Kevin and also contains, for the first time, a non-contest clause intended to prevent John from contesting the new will. It leaves $35,000 to Sarah’s sister, her personal property to her five children equally, and the residue of her estate (cash, investments and real estate) 1/9 to John and 2/9 to each of her other children.
d) September 3, 2004: 144 Smith Place LLC formed with Timothy as Manager. Timothy, as sole trustee of 144 Smith Place Realty Trust, deeds 144 Smith Place to 144 Smith Place LLC with 20% interest transferred to each of the live McGeoghean siblings.
e) September 4, 2004: Sarah is discharged from Massachusetts General Hospital for at-home hospice care.
f) September 10, 2004: Sarah executes another will identical to the previous August 24, 2004 will but which is not witnessed by Maureen (a beneficiary).
g) Night of September 12-13, 2004: Sarah dies.
h) September 27, 2004: Timothy, as Manager of the LLC, sends McGeoghean Construction a Notice to Quit for Non-payment of Rent for its tenancy of the 144 Smith Place property.
i) October 4, 2004: Timothy, Manager of the LLC, sends another Notice to Quit to McGeoghean Waste Systems for non-payment of rent for 144 Smith Place.
The Plaintiffs are seeking:
a. John’s ownership of 144 Smith Place (rescinding the conveyance of Smith Place to the Trust and then to the LLC);
b. Rescission of the 2001 real estate transfers from Sarah to J ohn’s siblings (three parcels of real estate described above);
c. John’s sole ownership of McGeoghean Construction;
d. Monies for defendants’ interference with inheritance; and
e. Kevin’s ownership of the Hyannis property or its value.
*531 Ownership of 144 Smith Place and of McGeoghean Construction Company
John’s claims to ownership of Smith Place and of the construction company are based on theories of promissory estoppel and unjust enrichment.
A claim for promissory estoppel requires proof that: (1) a promise was made that the promisor should reasonably expect to induce reliance by the promisee; (2) the promise induces detrimental reliance by the promisee; and (3) injustice can be avoided only by enforcing the promise. Loranger Constr. Corp. v. E.F. Hauserman Co., 6 Mass.App.Ct. 152, 154, 159 (1978), aff'd., 376 Mass. 757, 760 (1978): see Simon v. Simon, 35 Mass.App.Ct. 705, 711-12 (1994).
To prove unjust enrichment, a plaintiff must establish that a defendant holds assets that in fairness and good conscience should be plaintiffs.’ See: Santagate v. Tower, 64 Mass.App.Ct. 324, 329 (2005), citing Taylor Woodrow Blitman Constr. Corp. v. Southfield Gardens Co., 534 F.Sup. 340, 347 (D.Mass. 1982). See also M. McDonough Corp. v. Connolly, 313 Mass. 62, 64 (1943) (“[W]hen in equity and good conscience, one has property without right that ought to go to another, he cannot retain it”).
The Court finds that, when Sarah’s husband (John, Sr.) died in 1991, John continued to run his father’s construction business, as he had been doing for several years. Shortly after John, Sr.’s death, Sarah, John and the entire family met and agreed that the business would be owned 60% by Sarah and 40% by John, per financial contributions by each of them.[2] Later in 1991 and again in 1992 Sarah also promised John that Sarah’s 60% ownership of the business and her 50% ownership of 144 Smith Place, where the business was located, would be John’s if he continued to pay Sarah’s taxes, mortgage and other expenses on Smith Place and continued to pay her a “salary.”[3] In reliance on those promises, John’s companies have paid these personal expenses of Sarah as agreed from that time to the present, and no other family members have contributed to those expenses. These payments for the mortgage and taxes on Smith Place which were made by the construction company have totaled $816,568 over the years. The construction company and John’s waste disposal company also paid Sarah a “salary” and other contributions to her which totaled about $133,000 over the years.[4] As John owned 40% of the business, 40% of this $949,568, or $379,827, was John’s. These payments were made in reasonable reliance on Sarah’s promise that, if the expenses on Sarah’s property and Sarah’s salaiy were continued to be paid, Sarah’s ownership interest in the business and in Smith Place would be his.
In short, the evidence indicates that John justifiably relied on his mother’s promise that he would have entire ownership of the business and of 144 Smith Place if he continued to pay the costs of her Smith Place property, including the mortgage and real estate taxes, and continued to pay her a salary. This he continued to do until her death.
Nor had Sarah, by the time of her death, legally divested herself of her ownership in Smith Place. The purported transfer of her ownership to Smith Place LLC was attempted by way of an intricate scheme in 2004 at a time when Sarah was increasingly incapacitated, both mentally and physically, and was under the constant influence of Timothy and Maureen.
Although Sarah gave John a POA in 1994 and again in 2004, Sarah was persuaded to also give, contemporaneously, a POA to Timothy in 2001 and again in 2004, and to give a POA to Maureen in 2003, when Maureen was also given signatory authority over Sarah’s check book. In 2004, Frazer formed 144 Smith Place Realty Trust with Timothy as Trustee. Sarah then executed a deed conveying her 50% interest in Smith Place to the Trust, of which Timothy was the Trustee. Frazer, at Timothy’s request, then formed Smith Place LLC, with Timothy as the sole managing agent. Timothy, as sole Trustee of the Trust, then deeded Sarah’s interest in Smith Place to the LLC. Timothy, on behalf of the LLC, then filed a summary process action to evict John and the companies from Smith Place for non-payment of rent, also demanding past-due rent of $2500 for December 2005.
The Court finds that Sarah, while perhaps still competent, was increasingly incapacitated and was unduly influenced by defendants when, in March 2004, she executed her deed to Smith Place to the Realty Trust and when Timothy, in September 2004, with or without her knowledge,[5] then deeded Smith Place from the Trust to the LLC. The decedent’s mental capacity had begun to decline in 2001, and her eyesight had been failing for several years, ultimately making her legally blind. By 2004, when she signed the powers of attorney and deeded Smith Place to the Trust, Sarah was unable to read any document put in front of her and was terminally ill. I credit the testimony of Attorney Lany Frazer, whom Sarah consulted in regard to estate planning, who testified that Timothy expressed concern that Sarah was close to death at that time. While perhaps still mentally competent, her condition made her susceptible to defendants’ undue influence. If she even knew of Timothy’s intention to then deed Smith Place from the Trust to the LLC, of which Timothy was the sole manager, her conveyance to the Trust was “an unnatural disposition” in view of her promises to John and his reliance thereon.[6]
If injustice could be avoided only by specific performance of Sarah’s promises to John, the Court could order such even if it would violate the Statute of Frauds. See: Hickey v. Green, 14 Mass.App.Ct. 671, 673-77 (1982), and cases there cited. Here, however, the Court finds that injustice can be avoided by allowing John to recover in quantum meruit for the value of the benefits he provided to Sarah in reliance on her *532 promises. See: Shopneck v. Rosenbloom, 326 Mass. 81, 84 (1950), and cases there cited. In fact, the Supreme Judicial Court has upheld the application of quantum meruit recovery in a similar case where a son devoted himself to the family business in consideration of his father’s promise he would inherit a one-eighth share of the business. Slawsby v. Slawsby, 33 Mass.App.Ct. 465 (1992). Because the father in that case ultimately executed a codicil leaving all stock in the business to his wife, the Appeals Court held that quantum meruit was necessary to prevent the Statute of Frauds from becoming an instrument of fraud. Id. at 466, quoting Heil v. McCann, 360 Mass. 507, 511 (1971).
Although a quantum meruit award can be in an amount up to the value of the property promised, Atkinson, Wills, §48 at 219 (2d ed. 1953), in general, the appropriate measure of restitution is the value of the benefit that the promisee conferred on the promi-sor. Hastoupis v. Gargas, 9 Mass.App.Ct. 27, 35 (1980), citing what is now Restatement of Contracts (Second) ¶371, comment a (1981). In this case, John had the Construction and Waste Systems companies pay $949,568[7] to Sarah over the years in reliance on her promises that he would receive her interest in Smith Place and in the business. As he owned 40% of the construction company, 40% of the $949,568, or $379,827 of this amount, belonged to John.[8]
Alternatively, this Court could impose a constructive trust on the estate for the benefit of John. See: Sutton v. Valois, 66 Mass.App.Ct. 258, 266 (2006) (“[a] constructive . . . trust may be imposed to prevent injustice, unjust enrichment, or fraud”). The Supreme Judicial Court has recently approved the imposition of a constructive trust on the estate of a decedent whose will violated the terms of his agreement. See Nile v. Nile, 432 Mass. 390, 401-02 (2000) (“It is established that the heirs, next of kin, devisees, or personal representatives of a person determined to have breached an agreement to bequeath property to another shall hold such property in trust for the promisee”).
Here, however, the imposition of such a trust on the defendants could only be expected to result in endless continued squabbling among the siblings.[9] The Court will therefore award quantum meruit against the estate in the sum of $379,827, but will provide that this award may be satisfied by the defendants’ and the estate’s conveyance of their entire right, title and interest in Smith Place and the business to John, thus fulfilling Sarah’s promises.
The LLC’s Action to Evict the McGeoghean Businesses from Smith Place
As the Court finds that the LLC is not the rightful owner of Sarah’s interest in Smith Place, the LLC is not entitled to any rent and the LLC’s summary process action is DISMISSED.
The Littleton Property
When John’s marriage failed and he left the marital home in Concord, Sarah undertook to purchase a home in Littleton for John to live in. She purchased the property at 40 Powers Road in Littleton for $347,500, put up a down payment of $74,500, and signed a note and mortgage for $278,500. At the time of the closing, she expressed her intention that the property was being acquired for John,[10] and John has lived there ever since.
In November 2003, after John’s divorce was final, a purported deed from Sarah to John for the Littleton property was recorded. The HUD closing statement recites a price of $406,000, a gift from Sarah to John of $81,200, and the net proceeds of $49,749.69 to Sarah.
Defendants contend that Sarah’s signature on the deed was a forgery. But her prior signature on the purchase and sale agreement for the property is not disputed. Nor is the fact disputed that she had expressed her intention to others that the sale to John should occur, and had signed a letter on October 10, 2003 confirming her gift of $81,200 to John as a deposit toward his purchase of the Littleton properly, the authenticity of which is not disputed.[11] This gift, moreover, is consistent with her oft-expressed intention to treat her children roughly the same, in view of her other similarly-sized gifts in connection with her conveyances of her other real estate to her other children and her cash gifts to Kevin, which are discussed in detail below. See also chronology, para. 8.
Sarah’s deed of the property is also notarized. Once a party introduces prima facie evidence of valid execution of a deed, as was done here by way of the notarization, a party asserting that the document is not authentic has the burden of proof as to its having been a forgery. Keville v. McKeever, 42 Mass.App.Ct. 140, 157, 158 (1997) (holding that the inference of regularity and compliance with law supplied by a notary’s certificate was rebutted where, unlike here, the notary admitted that she notarized a signature on a deed that was not signed in her presence). See also: Hobson v. Hobson, No. 310562, 2007 WL 4945994 at *10 (Mass. Land Ct. Feb. 26, 2007), holding that the inference of regularity and compliance created by a notary’s certificate was not rebutted where the basic circumstances surrounding the notarization were unclear and the witnesses who contested the signature’s validity lacked credibility and gave contradictory testimony.
Here, the notary to the deed testified that Sarah’s signature, which he notarized, was authentic and signed in his presence at her home.[12] Defendants’ handwriting expert, moreover, while disputing the authenticity of Sarah’s signature on the deed and on her POA to Aaron Heesch, admitted that his opinion as to her signature’s having been forged on those documents, was only “tentative,” and that he could *533 render a definitive opinion only if he had been provided with her original signatures on the contested documents, which he was not.[13] Accordingly, the Court finds that not only did the conveyance to John unquestionably fulfill Sarah’s intentions, but that, in all of the circumstances, defendants have failed to sustain their burden of proof regarding the alleged forgery of Sarah’s signatures on the POA to Heesch and on the deed. Accordingly, defendants did not meet their burden of proof to overcome the presumption of regularity regarding the execution of the deed and the POA. The Court therefore rules that John is the rightful owner of the Littleton property.
The Sherman Street Project
In October 1997, property owned by Sarah at 91 Sherman Street was deeded for nominal consideration into a trust of which she and John were 50% beneficiaries, with the objective of building condominiums on the property. To this end, $1,300,000 was borrowed from the Salem Five Cents Savings Bank for which both John and Sarah signed a note and John gave a blanket mortgage on his other property. The records indicate that change orders were issued in the amount of $27,000. No other cash appears to have been expended on the construction, which was done by McG-eoghean Construction (of which Sarah was the 60% owner).
Construction was completed by the summer of 1998 and all of the units were sold between June and October. The gross sales price of the condominium units was $2,658,000.
Sarah was paid $350,000 (her original purchase price for the land which she donated to the project when the project was begun). According to defendants, after brokerage commissions and incidentals, there should have been between seven and eight hundred thousand dollars in profits, half of which should have gone to Sarah. The evidence, however, established that, after unanticipated additional construction costs and storm damage to the condos, the actual profit on the property was only $173,000, which amount was properly paid to John to reimburse him for his work on the project, Sarah, as agreed, having been reimbursed 100% of her contribution of the land to the project, in the sum of $350,000.
Accordingly, defendants’ claims in regard to the Sherman Street Project are DISMISSED.
The Hyannis Property
Kevin alleges that he had a conversation with his mother before moving into her Hyannis property during which she told him that she did not have any money to give him, suggested that he move into the property, and said that it would be given to him on her death. Kevin’s own recollection of this conversation, and his alleged belief that it was “understood” that his mother’s Hyannis property would go to him after her death, is the only proffered evidence in support of his claim to the property.
Kevin has struggled with a cocaine abuse problem for the past twenty years, and although he claims finally to have quit and to have been clean for the past two years, his mother’s financial support was, at times, used by Kevin to support his habit. In addition to giving him, free of charge, a roof over his head,[14] an audit of her bank accounts reveals she made cash gifts to him exceeding $200,000 in the last years of her life, which approximates the amount of her gifts to her other children, which are discussed below.
In these circumstances, there is no legal basis for promissory estoppel or for an award of quantum me-ruit to Kevin, so that any promise by Sarah to Kevin that he would be given the Hyannis home was without consideration and unenforceable. Accordingly, Kevin’s claims are DISMISSED.
Sarah’s Wills
In 2001, Sarah’s will bequeathed $200,000 outright to John, a testamentary gift of $400,000 in trust for Kevin, and the residue to Terrence, Timothy and Maureen.
By late 2003, Sarah’s financial situation had deteriorated because of stock market losses and her gifts of substantial sums to her children by way of “gift deeds” of her property, as well as large cash gifts to Kevin. She had also promised Smith Place and the business to John. Thus, between the 2001 will and the drafting of the 2004 will in March 2004, Sarah had gifted $237,000 to Maureen and her spouse in August 2001; $200,000 to Timothy and his spouse in September 2001; $237,000 to Terrence and his spouse in October 2001; $82,000 to John in 2003, and approximately $250,000 in cash to Kevin.[15] (See chronology, paras. 8-9.) She had thus, in divesting herself of a substantial portion of her assets, treated her children in a roughly equal manner.
The 2001 will, in which she had bequeathed an additional $200,000 to John and $400,000 to Kevin in trust, was therefore, by 2003, no longer consistent with her oft-expressed intention to treat her children equally. Accordingly, Sarah again contacted Frazer in early 2004 to prepare a new will. This new will, drafted by Frazer in early 2004, substantially altered the terms of her prior will. It eliminated the specific bequests to John and Kevin, left $35,000 to her sister (and caregiver), left her personal property to the five children equally, and left her remaining cash, securities, investments and real estate (the residue), l/9th to John and 2/9ths to each of the other children. The will also contained a no-contest clause.
Although Frazer initially prepared the will in March 2004, Sarah did not execute it until August 24, 2004, when she was once again hospitalized and was terminally ill.
*534 Were it not for her previously expressed intention to revise her 2001 will so as to treat her children equally in light of the then-changed 2003 circumstances, and the fact that the 2004 will does, while the 2001 will does not, conform to her expressed intention to treat her children equally, the Court might question Sarah’s competency to execute a will in August 2004 and whether it resulted from the undue influence of the defendants. In view of the fact that this will, unlike the 2001 will, conforms with her previous oft-expressed intentions, however, and in view of the fact that the witnesses to the will’s execution, as well as her primaiy-care physician who was treating her at the time,[16] all attested to her competency at the particular time of the will’s execution, the Court, acting under its Probate authority, approves the August 24, 2004 will and orders that its provisions be carried out.[17] See: Daly v. Hussey, 275 Mass. 28, 29 (1931), holding that even a person of pathologically unsound mind may possess testamentary capacity at any given time and lack it at all other times, citing May v. Bradlee, 127 Mass. 414 (1879), and Taylor v. Creeley, 257 Mass. 21, 29 (1926); Claffey v. Fenelon, 263 Mass. 427 (1928).
JUDGMENT
Accordingly, it is ordered that final judgment shall be entered as follows:
1. The purported conveyances of 144 Smith Place by Sarah McGeoghean to the Smith Place Realty Trust and by said Trust to Smith Place LLC are declared void. Judgment shall enter for John McGeoghean against the defendants and the estate of Sarah P. McGeoghean (a/k/a Sarah McGeoghan) in the sum of $379,827. In the alternative, defendants and the estate may satisfy this part of the judgment by conveying to John McGeoghean their entire right, title and interest in 144 Smith Place and in McGeoghean Construction Co. thereby carrying out Sarah McGeoghean’s promises to John McGeoghean.
2. Sarah McGeoghean’s will dated August 24, 2004 is approved and allowed.
3. The legal action entitled 144 Smith Place LLC v. McGeoghean Waste System, Inc., Middlesex Summary Process Docket No. 05-52SU24, is DISMISSED.
4. All other claims and counterclaims of the parties in the consolidated actions are found to be unproven and are also DISMISSED.[18]

She had handled the business’s accounts until her husband’s death, but performed no work for the business thereafter.

Testimony of Stephen Troiano, trial day VIII, tr. 8-9.

Contrary to defendants’ contention, Sarah expressed her intention that Smith Place was to be John’s not only to John but also to Kevin and to Sarah’s brother Hugh Devlin, a disinterested witness whose testimony I credit. See deposition of Hugh Devlin, trial exhibit 509, tr. 11-12, 20, 24-26. Nor does Sarah’s 2001 will indicate that she had any contrary intention regarding Smith Place, as her will did not specifically allude to Smith Place.

As noted, Sarah provided no services to the company after John, Sr.’s death.

lt is improbable that Sarah knew anything about it, as Timothy deeded Smith Place to the LLC just one day before she was discharged from the MGH for at-home hospice care and just ten days before her death.

A finding of undue influence requires that the will makes an “unnatural disposition,” i.e., that the testator is caused to act in a way which is contrary to her own untrammeled desire. Neill v. Brackett, 234 Mass. 367, 369 (1920); Heinrich v. Silvernail 23 Mass.App.Ct. 218, 223 (1986). See also: Estate of Tang, 69 Mass.App.Ct. 1115 (2007) (unpublished opinion).

 $816,568 for her real estate expenses plus $133,000 for her salary.

Defendants contend that this amount should be reduced because Sarah could have charged the business rent for its use of the property. Troiano’s tax treatment of the mortgage and tax payments on the company’s tax returns as a rental expense does not prove that the payments were intended as rent or considered by Sarah to be such. Indeed, Timothy admitted that he complained to Sarah in 2004 that John had never paid fair market rent. Nor was there any credible evidence as to what a fair rent would have been. The Court does not credit the testimony of Joel Miller, who is not a real estate appraiser and who never factored in the fact that the property is owned in common by a co-tenant. The Court finds that the mortgage and tax payments were not paid or received as rent but were paid for Sarah’s benefit in reliance upon her promise to John that Smith Place was to be his. (See testimony of John, trial day 1, tr. 71.)

This case presents the picture of an otherwise good family which, sadly, has become consumed with the siblings’ bitter envy of and disdain for one another. Sarah’s at-ümes contradictory actions, such as her granting to several of her children simultaneous and contradictory POAs, can only be understood as a vain attempt by her to mollify this bitter rivalry. Her attempts have so far proved unsuccessful, but the Court hopes that the time has now come when this bloody hatchet can at last be buried. Isn’t it time?

Testimony of Charles Ayer, trial day XII, tr. 9, 14-16.

The HUD statement, which her attorney, Aaron Heesch testified he signed for Sarah at the closing under her POA to him, also evidenced her intention to convey the property to John, which intention, indeed, was conceded by defendants’ counsel (trial day X3I, tr. 12). The so-called “Vaughn affidavit” which Sarah provided to the probate court during John’s divorce proceeding indicates nothing about Sarah’s true intent as to future conveyances to John, as her expressed objective at that time was to prevent John’s ex-spouse from getting her hands on John’s or Sarah’s property.

See testimony of Aaron Heesch, trial day IV, tr. 173,175, 200-03. He also testified that John gave him a POA from Sarah to enable him to sign documents at the real estate closing. Testimony of Aaron Heesch, trial day IV, tr. 168-71, 187-88.

See testimony of Paul McDonald, trial day XLV, tr. 129-32.

Around 2001, after the rent for his apartment in Cambridge was raised, Kevin moved into his mother’s home in Hyannis. He has lived there since 2001 without paying any rent to his mother during her lifetime, and has not paid any taxes or insurance costs on the property.

Testimony of Timothy McGeoghean, Trial Day V, tr. 17-18, 106-07.

 testimony of Dr. Allan Pinada, trial day X, tr. 36-44.

The Court finds that when Sarah was prevailed upon to re-execute her August 2004 will with a different witness just *535 two days before her death In September 2004, she was totally Incompetent.

These include unsubstantiated claims that John diverted corporate opportunities of McGeoghean Construction from Sarah and that he cheated Sarah out of her fair share of profits from his development of the Sherman Street condos. See testimony of Stephen Troiano, trial day VIII. John’s claim for rescission of Sarah’s real estate transfer to the defendants in 2001 is likewise unsubstantiated and was, indeed, waived at trial.